IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| ERIC CARTER, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 4:19-CV-02651 |
| ) | |
| ROBERT L. WILKIE ) | **JURY TRIAL DEMANDED** |
| Secretary of Veterans Affairs, ) | |
| ) | |
| Defendant. ) | |

## COMPLAINT

## PARTIES AND JURISDICTION

1. This is an action seeking equitable and monetary relief due to Defendant's discrimination against Plaintiff because of his disability and/or race and due to acts of reprisal because of Plaintiff's protected activity.

2. At all times relevant herein, Plaintiff, Eric Carter (hereinafter "Carter") was a federal employee of the United States Department of Veterans Affairs. He was employed as a Housekeeping Aid Team Leader in the Environmental Management Service at the St. Louis VA HCS Jefferson Barracks Division located in St. Louis County, Missouri.

3. Defendant Robert L. Wilkie is the Secretary of the Department of Veterans Affairs, which operates the St. Louis VA HCS located in the Eastern Division of the Eastern District of Missouri.

4. The Department of Veterans Affairs is and employer within the meaning of the Rehabilitation Act of 1973, Title VII of the Civil Rights Act of 1964, and the Family Medical Leave Act.

5. This action is brought pursuant to the Rehabilitation Act of 1973, as amended, 29

U.S.C. Sections 706, 791 *et seq.,* the Civil Rights Act of 1964, as amended, 42 U.S.C. Section 2000e *et seq.,* and the Family Medical Leave Act, 29 U.S.C. Section 2615 *et seq*. This Court has jurisdiction over this action pursuant to 28 U.S.C. Sections 1331 and/or 1343(a)(4).

6. All conditions precedent to the filing of this action have been met by Carter in that his informal and formal EEO complaints were timely filed with the Agency. He timely filed appeals with the Equal Employment Opportunity Commission, which will be dismissed by the EEOC with the filing of this action as to the discrimination, retaliation, and hostile work environment alleged prior to his termination. As to his termination/constructive discharge claim, a Final Agency Decision was transmitted on August 30, 2019, and this action was filed within thirty calendar days of receipt of the Final Agency Decision.

7. Venue is proper in this District pursuant to 28 U.S.C. Section 1391(b) as the judicial district where the acts giving rise to this claim occurred.

8. Plaintiff demands a trial by jury pursuant to Fed.R.Civ.P. 38(b).

## FACTS COMMON TO ALL COUNTS

9. Carter is a disabled Vietnam veteran with agoraphobia, as well as diabetes, neuropathy, and esophagitis. Carter is African American.

10. Carter began working for the VA as a housekeeper through the Compensated Work Therapy program in August 2009.

11. On or about January 2010, Carter was hired by Defendant. Upon information and belief, Carter was a Housekeeping Aid Team Leader at the time of his wrongful termination, although he had not been permitted to work in this position some time after he requested the accommodation of the 3rd shift for his disability of agoraphobia.

12. From the date of his hire until his wrongful termination, Carter worked the 3rd

shift (11:00 p.m. to 7:30 a.m.).

13. On or about July 24, 2016, Jeremy Leporin (hereinafter "Leporin"), Chief of the Environmental Management Service, told Carter he would be moving Carter from the 3rd shift to the 1st shift (7:00 a.m. to 3:30 p.m.).

14. Leporin is Caucasian.

15. Carter reminded Leporin that he suffered from agoraphobia and could not work the 1st shift because of the crowds.

16. On or about July 26, 2016, Carter requested a reasonable accommodation of continuing to work the 3rd shift because of his disability of agoraphobia, which was supported by his treating psychiatrist.

17. Defendant did not engage in an interactive process with Carter to determine how it could reasonably accommodate his disability when Carter requested this accommodation.

18. Instead of engaging in the required interactive process, Defendant retaliated against Carter by replacing him as a Housekeeping Aid Team Leader at Jefferson Barracks after he requested the reasonable accommodation of working the 3rd shift, which he had been working since he was hired.

19. On or about October 28, 2016, Carter timely filed a formal EEO complaint based upon Leporin's effort to remove him from the 3rd shift in violation of his need for reasonable accommodation.

20. On or about February 3, 2017, Leporin once again tried to move Carter from his 3rd shift assignment at Jefferson Barracks to the 2nd shift at John Cochran, effective February 20, 2017, knowing this would not accommodate Carter's agoraphobia.

21. On or about February 17, 2017, Carter was working the 3rd shift at John Cochran

because he was supposed to be on light duty when he was confronted by a supervisor, Tommy Lee (hereinafter "Lee"), who falsely accused Carter of not cleaning bathrooms Carter had cleaned, among other

things.

22. Carter became ill as a result of Lee's confrontation with him, resulting in his blood pressure being elevated and a nosebleed. Carter asked to leave work, which permission was given to him by Lee.

23. Carter was hospitalized from February 19 through February 27, 2017 after the confrontation with Lee. He was charged AWOL because he missed work related to this hospitalization.

24. On or about March 1, 2017, Defendant proposed to suspend Carter. This suspension was never issued because Defendant decided to terminate Carter instead.

25. On or about March 6 or 7, 2017, Carter was directed by Leporin to report to the 2nd shift at John Cochran (3:30 p.m. to 12:00 a.m.), even though this assignment would not accommodate his disability.

26. On or about March 9, 2017, Carter went to the JB Executive Office to inform Medical Center Director Keith Repko (hereinafter "Repko") that he was being sent home and put on WP when he reported to work. Carter also told Repko that he could not pay his bills as a result.

27. Repko and other members of the VA staff, who were notified that Carter was being prevented from working the shift that accommodated his disability (Fabian Grabski (Assistant Medical Center Director), Jeffrey Lockamy (Labor Relations Manager), and Toni Simmons (Human Resources)), did nothing. They are all Caucasian.

4

28. During the month of March 2017, when Carter attempted to work the 3rd shift consistent with the requirements of his disability, he was generally sent home.

29. During this same time period, on or about March 17, 2017, Leporin presented Carter with a Change to Lower Grade form. It stated that Carter's "voluntary request" to step down as a Housekeeping Aid Team Leader to a Housekeeping Aid had been granted effective March 19, 2017. This form advised Carter that his duty station and shift would remain at Jefferson Barracks on the 3rd shift.

30. Carter had not requested his own demotion and refused to sign the March 17, 2017 form. As a result, he was not permitted to work consistent with the requirements of his disability.

31. It was only on March 29, 2017, after Carter threatened to expose to the media that Defendant was not allowing a disabled veteran to work consistent with the requirements of his disability, that Carter was permitted to return to work on the 3rd shift.

32. On or about March 30, 2017 Fabian Grabski directed correspondence to Jeffrey Lockamy, copied to Jill Vaughn (Human Resources Manager,) and Leporin, that Carter was not allowed to work as a Team Leader. Inquiry was made as to whether his pay should be reduced as a result or whether the VA should bother to do so in light of Carter's planned termination.

33. Jill Vaughn is Caucasian.

34. On or about May 19, 2017, Carter was presented with a Proposed Removal by Leporin and Brian Kush (hereinafter "Kush"), Assistant Chief, Environmental Management Service.

35. Kush is also Caucasian.

36. Defendant, through Leporin and Kush, falsely accused Carter of several things to

5

justify his termination.  By way of example, Carter was accused of being AWOL on February 17, 2017, even though VA documents showed that his supervisor had permitted him to leave work. Carter was also falsely accused of being AWOL on March 7-10, 13-17, 21-24, and 28-29, 2017 for failing to report to duty from 11:00 p.m. – 7:30 a.m., which was the period of time that Carter was reporting to work and Defendant would not permit him to work.

37. In correspondence dated August 20, 2017, Repko rejected Leporin and Kush's attempt to terminate Carter but instead imposed a 10-day suspension.

38. Repko provided no reasons for his decision, which was arbitrary and capricious and designed to protect Caucasian supervisory employees of the VA who were discriminating and retaliating against Carter.  By way of example but no exhaustive of this arbitrary and discriminatory conduct on the part of Repko to protect other Caucasian supervisors:

   a. Based upon the false representation of Leporin and without any evidence to support this claim, Carter was found to have illegally parked his SUV in a handicap patient unloading area on March 20, 2017, even though the VA's own records show that Carter was not working on the day in question.

   b. On March 20, 2017, Carter was also falsely accused of working out of uniform, even though he was not working on the day in question.

   c. Carter was found to have been "willfully idle" on February 17, 2017 for reviewing work-related emails, as he was required to do, and for failing to clean a bathroom, even though the evidence showed the bathroom had been cleaned.

39. That Carter was disciplined because of Defendant's illegal discrimination and/or retaliation against him is best evidenced by Repko finding grounds to discipline Carter for the "failure to follow instructions," which instructions were that he report to duty on the 2nd shift in

violation of his reasonable accommodation and disciplining Carter for being AWOL when he reported to work and was sent home.

40. Even though Carter presented evidence that his Proposed Removal was part of a history of discrimination and retaliation against him by Leporin and Kush, upon information and belief no investigation was conducted into their conduct and no discipline was imposed to protect them and cover-up this illegal discrimination and retaliation.

41. On or about August 2, 2017, Carter filed a second formal EEO Complaint related to Defendant's effort to terminate him.

42. In a memorandum dated October 24, 2017, Leporin once again told Carter that he would be reassigned to the 2nd shift at John Cochran in violation of his reasonable accommodation. This change in Carter's hours took effect on December 4, 2017.

43. This shift change went into effect in violation of Carter's reasonable accommodation until KMOV reported on December 15, 2017 that Carter was reporting to work consistent with his reasonable accommodation only to be sent home and not paid. After KMOV contacted the St. Louis VA HCS, Carter was permitted to work the 3rd shift consistent with his reasonable accommodation.

44. On December 15, 2017, a St. Louis VA HCS spokesperson represented that it takes "these types of concerns very seriously" and that it was "actively working with [Carter] at this point."

45. Even though Defendant once again had actual knowledge that Carter's supervisors were not accommodating his disability, upon information and belief no investigation was conducted and no disciplinary action was taken against these supervisors, who were violating federal anti-discrimination laws.

46. On or about December 29, 2017, Defendant once again offered to reassign Carter to a housekeeping aid position, offering this demotion as a reasonable accommodation for his disability, even though Carter could work as a Team Leader on the 3rd shift.

47. On or about March 17, 2018 the VA contacted Carter (through counsel) asking if Carter wanted to amend his reasonable accommodation request in light of his service connected disability rating being increased.  A second request was made on April 18, 2018.

48. In March/April 2018, Carter did not request any further accommodation of his disability because his original reasonable accommodation request, to work the 3rd shift, had been repeatedly used to harass him and discriminate against him in an effort to fire Carter or force him to quit.  More importantly, it appeared that Defendant was finally leaving Carter alone to do his job, except that Kush required Carter to mop the tunnels by hand when there was a machine available to do this work, telling Carter the machine needed a part.  Carter was 61-62 years old when made to mop the tunnels by hand by Kush.

49. At the time, Carter did not realize that Defendant's Caucasian managers were once again plotting to fire him.

50. On or about June 4, 2018, Carter was issued another Proposed Removal by Leporin.

51. In the rush to terminate Carter, his Caucasian supervisors initially charged Carter with failing to report to work on days he was not even scheduled to work.

52. As part of the effort to terminate Carter, his Caucasian supervisors did not permit Carter to use FMLA leave he had available to him after Defendant arbitrarily denied him FMLA during a recertification process.

53. The June 4, 2018 Proposed Removal was so obviously defective that it was

8

rescinded after Carter responded to it.

54. Upon information and belief, the employee(s) who prepared the defective Proposed Removal as part of an ongoing effort to discriminate and retaliate against Carter were never disciplined.

55. Similarly, the mangers responsible for construction of a medical clinic at Jefferson Barracks that is 4 years behind schedule have not been held responsible for their conduct, in contrast to Carter, who was fired because his Caucasian supervisors did not want to accommodate his disability.

56. On or about July 2, 2018, Leporin reissued the Proposed Removal, even though Carter presented evidence on June 8, 2018 that showed that his Proposed Removal was further discrimination and retaliation against him.

57. In correspondence dated July 5, 2018 directed to Repko, Carter complained that the reissued Proposed Removal was further evidence of discrimination and retaliation.

58. In correspondence dated July 25, 2018, Carter was notified by Repko that he would be terminated effective August 3, 2018.

59. On August 2, 2018, Carter resigned from the VA before the effective date of his termination, believing this would be the only way he would be eligible for a disability retirement.

60. Carter filed a timely informal and formal EEO complaint related to his termination.

61. The Final Agency Decision related to Carter's termination/constructive discharge was transmitted on August 30, 2019.

## COUNT I
## DISABILITY DISCRIMINATION

For Count I of Plaintiff's cause of action against Defendant, he states as follows:

9

62. Plaintiff incorporates by reference as if fully set forth herein all preceding paragraphs of his Complaint.

63. Carter is a disabled person within the meaning of the Act.

64. Carter was qualified to perform the essential functions of his job with the reasonable accommodation of working the 3rd shift.

65. Carter suffered adverse employment actions under circumstances that give rise to an inference of unlawful disability discrimination when Defendant:

    a. Refused to honor Carter's reasonable accommodation of working the 3rd shift;

    b. Sent Carter home between March 7 and March 29, 2017 and charged him AWOL when he reported to work for the 3rd shift, the only shift that accommodated his disability;

    b. Issued Carter a 10-day suspension; and

    c. Terminated/constructively discharged Carter.

66. Carter could have continued to work for Defendant with the reasonable accommodation of working the 3rd shift, if he had not been terminated.

67. A reasonable person in Carter's situation would have found the working conditions Carter endured as set forth above intolerable.

68. The acts of the Defendant set forth above were intended to force Carter to quit and/or Carter's resignation the day before his termination became effective was a reasonably foreseeable consequence of Defendant's ongoing discriminatory and retaliatory conduct.

69. As a direct and proximate result of the acts of the Defendant as set forth herein, Carter has suffered and will continue to suffer lost wages and other benefits of employment.

70. As a direct and proximate result of the acts of the Defendant as set forth herein, Carter has suffered and will continue to suffer emotional pain, inconvenience, mental anguish, los of enjoyment of life, humiliation and stress.

WHEREFORE, Plaintiff Eric Carter prays that this Court enter judgment in his favor and against Defendant and thereafter make him whole by ordering Carter's reinstatement in a department outside of the Environmental Management Service that can accommodate his disability with backpay and enjoining Defendant, through its managerial employees, from discriminating against employees like Carter because of their disability, or alternatively, order Defendant to make Carter whole by awarding him damages for his past and future lost wages and benefits of employment, as well as for his emotional pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, humiliation and stress, award Carter his reasonable costs and attorney's fees, and such other and further relief as this Court believes to be equitable and just under the totality of the circumstances.

## COUNT II
## RETALIATORY DISCRIMINATION

For Count II of Plaintiff's cause of action against Defendant, he states as follows:

71. Plaintiff incorporates by reference as if fully set forth herein all preceding paragraphs of his Complaint.

72. Carter engaged in protected activity when he requested accommodation for his disability in July 2016 by asking to continue working the 3rd shift due to his agoraphobia, when he made other informal and/or formal reasonable accommodation requests, and/or sought to enforce his reasonable accommodation.

73. Carter also engaged in protected activity when he filed informal and formal complaints of discrimination against Defendant. Formal complaints were filed in October 2016

and August 2017.

    74. Adverse employment actions were taken against Carter when Defendant:

        a. Refused to reasonably accommodate Carter's disability;

        b. Sent Carter home between March 7 and March 29, 2017 and charged him AWOL when he reported to work for the 3rd shift, the only shift that accommodated his disability;

        c. Issued Carter the 10-day suspension on August 20, 2017; and

        d. Terminated Carter on July 25, 2018, effective August 3, 2018, resulting in Carter's resignation on August 2, 2018.

    75. There is a causal connection between Carter's protected activity and the adverse employment actions he suffered.

    76. Carter could have continued to work for Defendant with the reasonable accommodation of working the 3rd shift, if he had not been terminated.

    77. A reasonable person in Carter's situation would have found the working conditions Carter endured as set forth above intolerable.

    78. The acts of the Defendant set forth above were intended to force Carter to quit and/or Carter's resignation the day before his termination became effective was a reasonably foreseeable consequence of Defendant's discriminatory conduct.

    79. As a direct and proximate result of the acts of the Defendant as set forth herein, Carter has suffered and will continue to suffer lost wages and other benefits of employment.

    80. As a direct and proximate result of the acts of the Defendant as set forth herein, Carter has suffered and will continue to suffer emotional pain, inconvenience, mental anguish, loss of enjoyment of life, humiliation and stress.

WHEREFORE, Plaintiff Eric Carter prays that this Court enter judgment in his favor and against Defendant and thereafter make him whole by ordering Carter's reinstatement in a department outside of the Environmental Management Service that can accommodate his disability with backpay and enjoining Defendant, through its managerial employees, from retaliating against employees like Carter because of their protected activity, or alternatively, order Defendant to make Carter whole by awarding him damages for his past and future lost wages and benefits of employment, as well as for his emotional pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, humiliation and stress, award Carter his reasonable costs and attorney's fees, and such other and further relief as this Court believes to be equitable and just under the totality of the circumstances.

## COUNT III
## HOSTILE WORK ENVIRONMENT

For Count III of Plaintiff's cause of action against Defendant, he states as follows:

81. Plaintiff incorporates by reference as if fully set forth herein all preceding paragraphs of his Complaint.

82. Carter is a member of a protected group because of his disability and/or race.

83. Carter was subjected to an unwelcome hostile work environment as set forth in detail above.

84. There was a causal nexus between the hostile work environment Carter suffered and his disability and/or race.

85. The harassment Carter suffered affected a term, condition, or privilege of employment.

86. Carter was subjected to a hostile work environment by supervisory employees.

87. Carter could have continued to work for Defendant with the reasonable

accommodation of working the 3rd shift, if he had not been terminated as part of the ongoing hostile work environment.

88. A reasonable person in Carter's situation would have found the working conditions Carter endured as set forth above intolerable.

89. The acts of the Defendant set forth above were intended to force Carter to quit and/or Carter's resignation the day before his termination became effective was a reasonably foreseeable consequence of Defendant's hostile work environment.

90. As a direct and proximate result of the acts of the Defendant as set forth herein, Carter has suffered and will continue to suffer lost wages and other benefits of employment.

91. As a direct and proximate result of the acts of the Defendant as set forth herein, Carter has suffered and will continue to suffer emotional pain, inconvenience, mental anguish, loss of enjoyment of life, humiliation and stress.

WHEREFORE, Plaintiff Eric Carter prays that this Court enter judgment in his favor and against Defendant and thereafter make him whole by ordering Carter's reinstatement to a department outside of the Environmental Management Service that can accommodate his disability with backpay and enjoining Defendant, through its managerial employees, from creating a disability and/or race hostile work environment, or alternatively, order Defendant to make Carter whole by awarding him damages for his past and future lost wages and benefits of employment, as well as for his emotional pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, humiliation and stress, award Carter his reasonable costs and attorney's fees, and such other and further relief as this Court believes to be equitable and just under the totality of the circumstances.

## COUNT IV
## RACE DISCRIMINATION

For Count IV of Plaintiff's cause of action against Defendant, he states as follows:

92. Plaintiff incorporates by reference as if fully set forth herein all preceding paragraphs of his Complaint.

93. Carter is a member of a protected class, African American.

94. Carter was qualified for his position and performing his job duties adequately.

95. Carter suffered an adverse employment action when he was terminated or constructively discharged by Defendant.

96. The circumstances of Carter's discharge described above allow for the inference that unlawful race discrimination was involved in Carter's discharge.

97. Carter could have continued to work for Defendant with the reasonable accommodation of working the 3rd shift, if he had not been terminated.

98. A reasonable person in Carter's situation would have found the working conditions he endured as set forth above intolerable.

99. The acts of the Defendant set forth above were intended to force Carter to quit and/or Carter's resignation the day before his termination became effective was a reasonably foreseeable consequence of Defendant's discriminatory conduct.

100. As a direct and proximate result of the acts of the Defendant as set forth herein, Carter has suffered and will continue to suffer lost wages and other benefits of employment.

101. As a direct and proximate result of the acts of the Defendant as set forth herein, Carter has suffered and will continue to suffer emotional pain, inconvenience, mental anguish, loss of enjoyment of life, humiliation and stress.

WHEREFORE, Plaintiff Eric Carter prays that this Court enter judgment in his favor and against Defendant and thereafter make him whole by ordering Carter's reinstatement to a

department outside of the Environmental Management Service that can accommodate his disability with backpay and enjoining Defendant, through its managerial employees, from discriminating against employees like Carter because of their race, or alternatively, order Defendant to make Carter whole by awarding him damages for his past and future lost wages and benefits of employment, as well as for his emotional pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, humiliation and stress, award Carter his reasonable costs and attorney's fees, and such other and further relief as this Court believes to be equitable and just under the totality of the circumstances.

## COUNT V
## FMLA ENTITLEMENT CLAIM

For Count V of Plaintiff's cause of action against Defendant, he states as follows:

102. Plaintiff incorporates by reference as if fully set forth herein all preceding paragraphs of his Complaint.

103. Carter was an eligible employee under the Family Medical Leave Act, as evidenced by Defendant previously granting him such leave.

104. Carter was entitled to FMLA leave as evidenced by the VA approving him for FMLA leave through March 6, 2018. When Defendant notified Carter that he needed to renew his FMLA certification, he did so timely, continuing his eligibility for FMLA leave.

105. Carter gave Defendant notice of his intent to take FMLA leave when he requested it and renewed his certification for it.

106. Defendant denied Carter FMLA benefits to which he was entitled to justify his termination, an action that was not taken in good faith.

107. As a direct and proximate result of the denial of FMLA benefits to which Plaintiff was entitled he was terminated, resulting in the loss of wages and benefits.

WHEREFORE, Plaintiff Eric Carter prays that this Court enter judgment in his favor and against Defendant and thereafter make him whole by ordering Carter's reinstatement to a department outside of the Environmental Management Service that can accommodate his disability with backpay, or alternatively, order Defendant to pay Plaintiff damages equal to the wages and benefits lost to him as a result of Defendant's violation of the Family Medical Leave Act, the interest on this wage and benefit loss at the prevailing rate, liquidated damages equal to the wage/benefit loss and interest, award Carter his reasonable costs and attorney's fees, and such other and further relief as this Court believes to be equitable and just under the totality of the circumstances.

Respectfully submitted,

**PLEBAN & PETRUSKA LAW, LLC**

By: /s/ Lynette M. Petruska
Lynette M. Petruska, Bar No. 41212
lpetruska@plebanlaw.com
J.C. Pleban, Bar No. 63166
jc@plebanlaw.com
2010 South Big Bend Blvd.
St. Louis, MO 63117
(314) 645-6666 - Telephone
(314) 645-7376 - Facsimile

Attorneys for Plaintiff