**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ERIC CARTER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:19CV2651 JCH |
| | ) | |
| DENIS MCDONOUGH, | ) | |
| Secretary of Veterans Affairs, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM AND ORDER**

This matter is before the Court on Defendant Denis McDonough's Motion for Summary Judgment, and Plaintiff Eric Carter's Motion for Partial Summary Judgment, both filed May 28, 2021. (ECF Nos. 45, 47). The motions are fully briefed and ready for disposition.

**BACKGROUND**

Plaintiff Eric Carter, a disabled African-American veteran, began working for the U.S. Department of Veterans Affairs ("VA"), Environmental Management Service ("EMS") at the Jefferson Barracks campus as a Housekeeping Aid, and then was promoted to a Housekeeping Aid Lead on or about November 17, 2013. (Defendant's Statement of Uncontroverted Material Facts ("Defendant's Facts"), ¶ 1). Plaintiff claims to suffer from PTSD, agoraphobia, diabetes, neuropathy, and esophagitis. (Compl., ¶ 9; Plaintiff's Statement of Undisputed Facts in Support of Partial Summary Judgment ("Plaintiff's Facts"), ¶ 18). He was hired by the VA through the VA's Compensated Work Therapy Program, which provides "support to Veterans living with mental illness or physical impairment with barriers to employment to secure and maintain community based competitive employment." (Plaintiff's Facts, ¶¶ 16, 17, quoting Plaintiff's

Exh. 11).

Plaintiff worked the nightshift from the time he was hired until he left the employ of the VA.[1]   (Plaintiff's Facts, ¶ 20).   In January of 2011, Plaintiff signed a document from the VA Medical Center with the subject "Acknowledge of Understanding", in which he agreed that in accepting the appointment with the VA he fully understood he was subject to changes in assigned duty schedules and locations within the VA Medical Center in St. Louis.   (Defendant's Facts, ¶ 26).[2]

The hierarchy for Plaintiff's position in EMS was as follows:   Housekeeping Aids, Housekeeping Aid Lead, Supervisor, Assistant Director, and Director.   (Defendant's Facts, ¶ 2). Over time, Plaintiff had different supervisors to whom he would report; during the relevant time frame Brian Kush, Assistant Director of EMS, was his second level supervisor, and Jeremy Leporin, Director of EMS, was his third level supervisor.[3]   (Id., ¶ 3).   Leporin reported directly to Fabian Grabski[4], Associate Director of the St. Louis VA and Designated Management Official ("DMO") for disability accommodations involving EMS.   (Plaintiff's Facts, ¶¶ 5, 7-8).

In his position as Housekeeping Aid Lead, Plaintiff was in charge of the entire Jefferson Barracks campus, which includes three inpatient buildings, administrative/office space, and clinic space.   (Defendant's Facts, ¶ 24).[5]   One of the major duties of a Housekeeping Aid Lead, according to the Position Description, is to lead a unit or team of 5 to 15 employees performing

---

[1] EMS has three shifts:  7:30 a.m. to 3:30 p.m. (day or first shift), 3:30 p.m. to 12:00 a.m. (evening or second shift), and 11:00 p.m. to 7:30 a.m. (night or third shift).  (Plaintiff's Facts, ¶ 36).  The dayshift is the most crowded in terms of employees and patients, followed by the evening shift and then the nightshift.  (Id.).

[2] Plaintiff admits he signed the document, but asserts Defendant still had a duty to reasonably accommodate his disability.  (Plaintiff's Response to Defendant's Facts, ¶ 26).

[3] Both Kush and Leporin are Caucasian.  (Plaintiff's Facts, ¶¶ 4, 5).

[4] Grabski is Caucasian.  (Plaintiff's Facts, ¶ 7).

[5] Plaintiff described the position as very physical, as it required him to move laundry bins from one end of a building to another.  (Defendant's Facts, ¶ 25).

work at the WG-1 or WG-2 level.  (*Id.*, ¶¶ 6, 7).[6]  Therefore, in his position as a Housekeeping Aid Lead, in addition to completing his own assignment of scrubbing the floors of a tunnel that connected buildings at the Jefferson Barracks campus, Plaintiff would give assignments to the Housekeeping Aids on his shift and ensure they were performing.  (*Id.*, ¶ 5).  Although during the 2016-2018 time frame there were ten allotted or funded positions for Housekeeping Aids on third shift at Jefferson Barracks, Plaintiff maintains there were only four full-time equivalents (including the Lead) on the night shift, and he frequently worked with only one other person. (*Id.*, ¶ 9 and Plaintiff's response thereto).

VA employees are evaluated each year in April and October.  (Plaintiff's Facts, ¶ 28). According to Plaintiff's 2015/2016 and 2016/2017 performance appraisals, a Lead had five critical functions:  (1) assignments, (2) bed cleaning, (3) safety, (4) organizational support, and (5) lead duties.  (*Id.*, ¶ 29).  S/he had two noncritical functions:  (1) equipment/tools/closet and (2) maintenance.  (*Id.*).  During the periods of October 2015 through September 2016 and October 2016 through September 2017, Plaintiff was evaluated as fully successful as a Lead. (*Id.*, ¶¶ 32, 33).  At times he was rated as exceptional in certain areas, and on December 24, 2017, Plaintiff was given a pay raise, noting that his work was at an acceptable level of competence for a Lead.  (*Id.*, ¶¶ 34, 35).

On or about June 7, 2016, the VA issued a Proposed Admonishment to Plaintiff regarding his alleged failure to follow supervisor's instructions.  (Defendant's Facts, ¶ 48; Defendant's

---

[6] Although Plaintiff admits that the Position Description provided that the duties of a Housekeeping Aid Lead included leading a unit of 5-15 employees, Plaintiff claims that in his position on the night (or third) shift, he only led a group of 2-3 Housekeeping Aids until another Lead was assigned to the shift.  (*See* Defendant's Facts, ¶ 8 and Plaintiff's response thereto).

Exh. Y).[7]  EMS rescinded the Admonishment, and instead issued Plaintiff a Proposed Reprimand dated July 29, 2016.  (*Id.*, ¶¶ 52, 53; Defendant's Exh. R).[8]  The parties agree the recommendation to issue the Proposed Reprimand would have been made before July 29, 2016, although they dispute how far in advance Human Resources ("HR") would have received the recommendation before issuing the discipline.  (*Id.*, ¶ 54 and Plaintiff's response thereto).[9]  EMS then issued a Notice of Reprimand dated October 4, 2016, based on the July 29, 2016 Proposed Reprimand, with charges of unauthorized absences between June 26, 2016, and July 23, 2016; failure to follow supervisor's instructions on May 31, 2016, and June 28, 2016; disrespectful conduct toward a VA employee on July 11, 2016, and July 25, 2016; and making unfounded slanderous statements about a VA employee on July 12, 2016.  (*Id.*, ¶ 53; Defendant's Exh. R).[10]

Leporin testified that at some point Kush issued a directive to move Plaintiff from third shift to day shift, because of "a combination of his inconsistency of being at work and his failure to follow instructions by the supervisor."  (Defendant's Facts, ¶ 49, quoting Leporin Dep. at 161:1-16).[11]  Leporin testified that due to Plaintiff's attendance issues, EMS "could accommodate him a lot easier on another shift, because if he wasn't there, it didn't impact the

---

[7] Specifically, the Proposed Admonishment stated that on May 31, 2016, Plaintiff was told by his supervisor to scrub and burnish the floors in the Audiology department, but Plaintiff failed to do so.  (Defendant's Exh. Y).

[8] Plaintiff notes the Proposed Reprimand was issued four days after EMS learned of Plaintiff's disability.  (*See* Plaintiff's Response to Defendant's Facts, ¶ 52).

[9] It is undisputed that the majority of the alleged misconduct cited in the July 29, 2016, Proposed Reprimand occurred before Plaintiff told Leporin about his agoraphobia.  (Defendant's Facts, ¶ 55).

[10] Plaintiff disputes a number of the charges in the Notice of Reprimand.  (Plaintiff's Response to Defendant's Facts, ¶ 53).

[11] Plaintiff counters that at the time, Kush stated the reason for the tour of duty ("TOD") change was because Plaintiff was taking Family Medical Leave Act ("FMLA") leave, which could better be accommodated on the first shift.  (*See* Plaintiff's Response to Defendant's Facts, ¶ 49).  Defendant replies that Leporin testified Plaintiff was moved due to his leave in general, which included FMLA leave but also leave abuse.  (*See* Defendant's Reply to Plaintiff's Response to Defendant's Facts, ¶ 49).

service the same, because we'd have other team leaders and other supervisors to fill his shoes." (*Id.*, ¶ 50, quoting Leporin Dep. at 161:17-22).  Jessie Fuller, a non-disabled Housekeeping Aid Lead, was moved from afternoon shift to night shift.[12]   (*Id.*, ¶ 51 and Plaintiff's response thereto).

On or about July 25, 2016, Leporin informed Plaintiff he planned to transfer him from third shift to a daytime shift.[13]  Plaintiff disclosed that he suffered from agoraphobia, a condition that prevented him from working any shift other than the nightshift.  (Defendant's Facts, ¶¶ 57, 59; Plaintiff's Facts, ¶ 128).  Leporin testified that he told Plaintiff to apply for a reasonable accommodation ("RA")[14] if something prevented him from working another shift.  (Plaintiff's Facts, ¶ 128).  It is VA policy to "provide reasonable accommodations to individuals with disabilities to allow them to fully participate in the application process, perform essential job functions, and enjoy equal benefits and privileges of employment, in accordance with all applicable laws, regulations, and VA policies, unless to do so would cause a direct threat to health and safety or undue hardship to the operation of the unit."  (*Id.*, ¶ 79, quoting Plaintiff's Exh. 7, § 3(a)).  The policy in turn defines "essential functions of a job" as "the occupational duties that are fundamental to the position to the extent that the individual cannot do the job without being able to perform them....If a function is listed in the position description as an essential function, but is not performed by the incumbent or takes only a few hours per week, it is not usually considered 'essential' for purposes of accommodation."  (*Id.*, ¶ 80).  The policy further defines "direct threat" as "[a] significant risk (high probability) of substantial harm to the

---

[12] Fuller did not request the shift change.  (Plaintiff's Facts, ¶ 124).

[13] The TOD change was to take effect on August 8, 2016, unless grieved by the AFGE. (Plaintiff's Facts, ¶ 123).

[14] Pursuant to VA policy, a RA request is an oral or written request made by an employee or representative (to include a healthcare professional), which does not require the words "reasonable accommodation" or "disability" to be used.  (Plaintiff's Facts, ¶ 83).

health or safety of the employee or to others that cannot be eliminated or reduced by a reasonable accommodation.  The DMO and Local Reasonable Accommodation Coordinator (LRAC) must engage in an individualized assessment that is based on the medical documentation and the best available objective evidence.  Thus, this decision cannot be based on assumptions, unwarranted fears, generalizations, stereotypes, or myths about a particular disability." (*Id.*, ¶ 82).

Plaintiff gave Leporin a statement from his VA doctor, Dr. Ranjit Ram, dated July 25, 2016, stating that Plaintiff currently was being treated for agoraphobia, and it was in his best interest to continue working the night shift due to his issues regarding being around large crowds.  (Plaintiff's Facts, ¶ 130; Defendant's Facts, ¶¶ 60, 61).[15]  Leporin forwarded the note from Dr. Ram to HR, and on or about July 26, 2016, Anthony Wright, Labor Relation Specialist, informed Plaintiff's AFGE representative, Vanessa McDonald, that Plaintiff should apply for a RA with Joel Peacock, the LRAC.[16]  (Defendant's Facts, ¶¶ 63, 64).  Wright further advised that Plaintiff should ask Dr. Ram to redo the note, so the department could better understand how many people constituted a crowd.  (*Id.*).  McDonald testified that she would have let Plaintiff know that his doctor needed to redo the note in a time close to receiving the email from Wright. (*Id.*, ¶¶ 65, 66).

On or about July 26, 2016, Plaintiff's AFGE representative issued to Leporin a Demand to Bargain on Plaintiff's tour change.  (Defendant's Facts, ¶ 68).  The parties agree that management was unable to make any changes to working conditions while there was a Demand to Bargain in place, and that it takes up to sixty days for such a demand to be resolved.  (*Id.*, ¶¶

---

[15] Leporin was the first person at work to whom Plaintiff disclosed this condition; prior to July 25 or 26, 2016, Plaintiff had never given his supervisors or managers written documentation about his agoraphobia.  (Defendant's Facts, ¶¶ 58, 62).

[16] Among other things, the LRAC assists supervisors and management officials in processing RA requests.  (Plaintiff's Facts, ¶ 12).

69, 70).   The parties disagree as to whether Plaintiff had already submitted a RA request, however[17]; VA policy requires that ordinarily the VA must process such requests within thirty days (unless it is waiting for medical documentation).   (*Id.* and Plaintiff's response thereto).   In any event, Plaintiff was permitted to remain as a Housekeeping Aid Lead on the third shift.   (*Id.*, ¶ 71).   While Defendant maintains he was allowed to do so as a provisional accommodation until the RA process was completed, Plaintiff counters he was left on third shift because the Demand to Bargain required such.   (*Id.* and Plaintiff's response thereto).[18]   Leporin testified that EMS kept Fuller on as Housekeeping Aid Lead on third shift as well, because it "needed somebody to be able to respond," and it "didn't want to put Mr. Carter in harm's way by, you know, impacting his emotional or mental stability because we're forcing him to respond to things that, you know, he's got a mental illness that doesn't allow him to."   (*Id.*, ¶ 72; Leporin Dep. at 166:20-167:15).[19]

In a statement dated September 12, 2016, Dr. Ram wrote that Plaintiff has difficulty functioning in crowds[20], and he requested an accommodation allowing for Plaintiff to remain on the night shift, where there is a reduced number of personnel.   (Defendant's Facts, ¶ 73).   On September 22, 2016, Plaintiff himself submitted a request for an accommodation to work the

---

[17] Plaintiff maintains the July 25, 2016, letter from Dr. Ram constituted a request for reasonable accommodation.

[18] According to Plaintiff, a provisional accommodation is made using a Form 0857c, which was never issued to Plaintiff.   (Plaintiff's Response to Defendant's Facts, ¶ 71).

[19] Plaintiff notes no evidence was presented that he was mentally unable to respond to any situation that arose on the third shift during the two years and eight months he was a Lead.   (Plaintiff's Response to Defendant's Facts, ¶ 72).   He further responds that he was reassigned to the second shift, "which did not accommodate his disability, despite this purported concern about putting Carter in harm's way as a Lead."   (*Id.*).

[20] Dr. Ram opined that "crowd" could not be defined in general; instead, he suggested that Defendant explore Plaintiff's own personal comfort level directly with Plaintiff.   (Defendant's Facts, ¶ 73).   Plaintiff claims that no manager or supervisor ever talked to him about what constituted a crowd to him.   (Plaintiff's Facts, ¶ 165).

night shift.  (*Id.*, ¶ 75).[21]

On or about October 5, 2016, Plaintiff submitted a Written Confirmation of Request for Accommodation, with information provided by Dr. Ram on a form called Request for Medical Documentation.  (Defendant's Facts, ¶ 76).  In response to "[t]he key duties that your patient has advised that he/she is unable to perform, or benefits and privileges of employment that he/she is unable to enjoy," Dr. Ram indicated that Plaintiff was unable to work in a crowded situation. (*Id.*, ¶ 77).[22]  In response to "the extent or degree to which the impairment limits an activity," Dr. Ram indicated, "Because of extreme agoraphobia, [Plaintiff] is unable to be around more than 2 or 3 known people during his work."  (*Id.*, ¶ 78).[23]  Plaintiff did not include lifting restrictions, lifting requirements or lifting limitations in his Written Confirmation of Request for Accommodation, nor did he request an accommodation for such.  (*Id.*, ¶¶ 79, 80).[24]

Leporin remembers HR asking him what was required of a Housekeeping Aid Lead. (Defendant's Facts, ¶ 85).  He testified that HR "specifically focused on the need for a team leader to be around groups of people," and Leporin explained that the Housekeeping Aid Lead is "expected to lead up to 15 people, they will deal with customer service issues, they will deal with patient issues, and they will be expected to respond to emergencies in a group setting."  (*Id.*, ¶

---

[21] As noted above, Plaintiff maintains he had already submitted a request for accommodation, in the form of his July 25, 2016, letter from Dr. Ram.  (Plaintiff's Response to Defendant's Facts, ¶ 75).

[22] Plaintiff notes that Dr. Ram further stated that Plaintiff was able to work the night shift. (Plaintiff's Response to Defendant's Facts, ¶ 77).

[23] Plaintiff maintains that he told Dr. Ram there were three people he worked with, but he believed he was capable of working with around six or seven.  (Plaintiff's Facts, ¶ 168).

[24] Plaintiff admits he did not include lifting restrictions in his Written Confirmation of Request for Accommodation, but states it was because said restrictions were not in place at the time he completed the request.  (Plaintiff's Response to Defendant's Facts, ¶¶ 79, 80, 105).

86, quoting Leporin Dep. at 94:2-94:17).[25]   While Leporin did not tell HR that Plaintiff could not be a Housekeeping Aid Lead because of his agoraphobia, he testified that "[w]ith that disability you can't be a team leader if you can't be around more than two or three people."  (*Id.*, ¶ 87, quoting Leporin Dep. at 94:18-24).[26]   Leporin testified that he discussed with Jeff Lockamy[27] and Toni Hollo in HR whether keeping Plaintiff on third shift as a Housekeeping Aid Lead would create an undue hardship for EMS, and concluded there would have been undue hardship because EMS needed "leadership available 24/7" and if Plaintiff "wasn't capable of doing his job because he can't be around crowds of people, or he's not mentally stable, that would impact patient care and patient safety…for long periods of time every day."  (*Id.*, ¶¶ 88, 89, quoting Leporin Dep. at 155:1-15).[28]   Leporin further testified he told HR that allowing Plaintiff to remain on third shift would be "impacting his disability [] [b]ecause he'd still be expected to lead up to 10 people, plus he'd have to encounter patients and staff and respond to emergencies," and further would not have met the restrictions from Dr. Ram that Plaintiff could not work with more than two or three people.[29]   (*Id.*, ¶¶ 90, 91, quoting Leporin Dep. at 168:1-16).[30]

The LRAC ultimately determined that Plaintiff was no longer able to perform the

---

[25] While the parties agree that the Position Description is generally the same for all shifts, Plaintiff maintains the number of housekeeping aids a Lead supervised varied by shift and location.  (Defendant's Facts, ¶ 84 and Plaintiff's response thereto).

[26] Plaintiff admits that Leporin so testified, but notes Leporin nevertheless assigned Plaintiff to be a Lead on a shift that would not accommodate his disability effective February, 20, 2017, March 7, 2017, and December 4, 2017.  (Plaintiff's Response to Defendant's Facts, ¶ 87).

[27] Lockamy is Caucasian.  (Plaintiff's Facts, ¶ 11).

[28] While Plaintiff acknowledges Leporin testified as described, he maintains the VA never documented the alleged hardship on a Form 0857f.  (Plaintiff's Response to Defendant's Facts, ¶¶ 88, 89).

[29] In attempting to determine which positions Plaintiff could do given his agoraphobia, Leporin explained that they go by the restrictions as prescribed by the doctor.  (Defendant's Facts, ¶ 92).

[30] Plaintiff admits Leporin claimed he told this to HR, but denies it is true, stating instead that he worked with only 2-3 people on the night shift.  (Plaintiff's Response to Defendant's Facts, ¶¶ 90, 91).

essential functions of his current position, due to the functional limitations caused by his disability. (Defendant's Facts, ¶ 94).[31]  Defendant therefore issued an Employee Limitations on Reassignment Options form, which stated that the "VA would like to retain you as an employee. Therefore, we are offering to seek a suitable position for you.  VA will not be able to create a new position; we are limited to identifying an existing position.  Please review the options listed below and check those you are willing to consider.  Please consider as many options as possible to aid our effort to identify a suitable reassignment."  (*Id.*, ¶ 95, quoting Defendant's Exh. G). On October 19, 2016, Plaintiff indicated on the form that he was willing to consider reassignment to a different type of position for which he was qualified, and listed "truck driver or any other position" as possibilities.  (*Id.*, ¶ 96).[32]  He did not indicate that he was interested in a driver position outside of EMS, nor did he state a willingness to go to a lower grade position if no position was available at his current pay level.[33]  (*Id.*, ¶ 97; Plaintiff's Facts, ¶ 170).

On October 22, 2016, McDonald sent Plaintiff's resume to Peacock for his reasonable accommodation.  (Defendant's Facts, ¶ 98).  On October 28, 2016, Peacock wrote in an email to McDonald that there were no open positions in Logistics, and that he would continue to look for a position for which Plaintiff was qualified and that met his medical requirements, but the process could last up to ninety days.  (*Id.*, ¶ 99).

---

[31] Plaintiff responds that had Defendant truly determined his request to work the nightshift could not be accommodated, he should have issued a Form 0857g.  (Plaintiff's Response to Defendant's Facts, ¶ 94).  He further claims that had such a determination been made, Defendant would not have attempted to move him to Lead on first or second shift, as said shifts would not have accommodated his disability either.  (*Id.*).

[32] Plaintiff notes that the Accommodation Request Determination (Form 0857f) stated that Plaintiff was requesting an accommodation of either "a drivers position or to be placed on the night shift."  (Plaintiff's Response to Defendant's Facts, ¶ 95, quoting Defendant's Exh. H).

[33] Plaintiff maintains that he submitted the Employee Limitations on Reassignment Options form to "get away from the harassment because it was getting to be too much," and that he "wanted a driver's job to be completely out of EMS."  (Plaintiff's Facts, ¶ 171).

On or about January 25, 2017, the VA offered Plaintiff the position of a Motor Vehicle Operator ("MVO"), WG-5703-4, or linen driver.  (Defendant's Facts, ¶ 102).  The linen driver position was a grade 4, which was higher than the position in which Plaintiff was working as Housekeeping Aid Lead.  (*Id.*, ¶ 103).  According to Defendant, the linen driver position met the requirements contained in Dr. Ram's October 4, 2016, note, as Leporin testified the linen driver "would just drive dock-to-dock, and they would actually stay in the truck.  So they would never even have to see people unless they—except for the linen supervisor and maybe the employee that rode in the truck with him that would actually push the carts to the delivery point."  (*Id.*, ¶¶ 104, 105, quoting Leporin Dep. at 178:25-179:20).[34]  Plaintiff declined to accept the linen driver position on or about January 27, 2017.  (*Id.*, ¶ 106).  Plaintiff asserts he declined the position because he had seen his VA doctor the day before, on January 26, 2017, and was told he could not lift over 15 pounds or move laundry bins.  (Plaintiff's Response to Defendant's Facts, ¶ 105).  He further maintains he was not informed he could accept the position and begin working when his medical restrictions were lifted; instead, Plaintiff states he was told he would have to start immediately and work the position on his own.  (*Id.*).

After Plaintiff declined the linen driver position, he did not submit another "Written Confirmation of Request for Accommodation" form to the VA.  (Defendant's Facts, ¶ 110).  According to Defendant, by declining the linen driver position that met the requirements of his medical limitations and for which he was qualified, Plaintiff "indicated that he did not want to

---

[34] Plaintiff denies this depiction, noting that according to the MVO position description, Plaintiff would be required to assist other employees in receiving, unloading, classifying, weighing, sorting, folding, and hoisting supplies/linens, as well as cleaning soiled areas and equipment. (Plaintiff's Response to Defendant's Facts, ¶ 104).  Plaintiff maintains the position also would require him to lift up to 40 pounds, and frequently handle heavily laden linen carts.  (*Id.*).

push through the process, so then the process ends." (*Id.*, ¶ 111).[35]  Leporin testified that he then

spoke to HR about the impact of Plaintiff's decision, and was told that he could move Plaintiff to

another shift.  (*Id.*, ¶ 112).  He testified that he understood EMS could use Plaintiff wherever

they wanted based on the needs of the operation, because once the RA was closed and Plaintiff

did not accept it, "that's him stating that he doesn't need an accommodation, or he needs to

resign, because he didn't accept it." (*Id.*, ¶ 114, quoting Leporin Dep. at 181:20-182:10).[36]

       In February of 2017, after Plaintiff declined the proffered RA, EMS gave him a TOD

change to second shift, and a duty station change from Jefferson Barracks to John Cochran.

(Defendant's Facts, ¶ 116; Plaintiff's Facts, ¶ 186).  On March 15, 2017, McDonald sent an

email to Medical Center Director Keith Repko[37], Grabski, Lockamy, Leporin and Tammy

Johnson (another AFGE representative), stating that "Carter has decided to work at JB on the 3rd

shift as a HKPA (Housekeeping Aid) starting on Friday, March 17, 2017.  After talking with

Tammy Johnson and myself, Mr. Carter said he would be willing to do this even though he will

get a reduction in pay and not be a WL but a HKPA." (Defendant's Facts, ¶ 118, quoting

Defendant's Exh. T).[38]  In March of 2017, the VA offered Plaintiff the opportunity to step down

to the position of Housekeeping Aid on third shift voluntarily, but Plaintiff refused to sign the

document enacting said change.  (*Id.*, ¶¶ 119, 121).  According to Defendant, when Plaintiff

refused to accept the change to a lower grade in March of 2017, the expectation was that he

would report to his assignment as a Housekeeping Aid Lead on second shift.  (*Id.*, ¶ 124).

---

[35] Plaintiff maintains that allowing the process to end meant that he would return to his original
position before requesting the RA, *i.e.*, Lead on the night shift, and that he would be accountable
for performance in that position.  (Plaintiff's Response to Defendant's Facts, ¶ 111).
[36] Again, Plaintiff asserts that at the time the RA was closed, he was working as Lead on the shift
that accommodated his disability.  (Plaintiff's Response to Defendant's Facts, ¶ 114).
[37] Repko is Caucasian.  (Plaintiff's Facts, ¶ 10).
[38] Plaintiff denies that he agreed to accept a demotion.  (Plaintiff's Response to Defendant's
Facts, ¶ 118).

On March 1, 2017, AFGE sent an email to Leporin, Grabski, Repko and others asking whether they intended to violate Plaintiff's doctor's statement by sending him to the second shift. (Plaintiff's Facts, ¶ 191).  Leporin responded that the VA was not violating the doctor's note, as Plaintiff had refused the RA.  (*Id.*).  Leporin claimed that Plaintiff's Lead position required him to be around groups of people, and there already was a Lead on third shift.  (*Id.*).  According to Leporin, if Plaintiff wanted to be a Lead he could be one on the second shift, the only shift on which such position was available.  (*Id.*, ¶¶ 191, 192).  At that point, AFGE said it was not feasible for Plaintiff to work the second shift, so the issue would be taken higher.  (*Id.*, ¶ 193).[39]

In March of 2017, Leporin instructed the supervisors that if Plaintiff reported to the third shift they were to send him home, and in fact, when Plaintiff tried to work the nightshift in March, he was sent home.[40]  (Defendant's Facts, ¶ 125; Plaintiff's Facts, ¶ 197).  EMS first discussed with HR a proposed 2-day suspension for Plaintiff, then increased it to a 14-day suspension, and then rescinded the proposed suspension and made it a proposed removal because Plaintiff "continued to offend."  (Defendant's Facts, ¶ 126, quoting Leporin Dep. at 248:17-250:4, 251:12-20).[41]  EMS issued a Proposed Removal to Plaintiff dated May 19, 2017, with charges for unauthorized absences in February, March, and April of 2017; idleness on February

---

[39] Jill Vaughn, Human Resources Officer at the St. Louis VA, testified that she could not explain how Plaintiff could work as a Lead on the second shift but not on the nightshift, because she claimed she did not understand the question.  (Plaintiff's Facts, ¶¶ 15, 189, citing Vaughn Dep. at 177:12-18).  Vaughn is Caucasian.  (*Id.*, ¶ 15).

[40] On March 29, 2017, Plaintiff (through counsel) sent an email to Lockamy, stating that if the VA continued to prohibit Plaintiff from working the third shift, which accommodated his disability, the media would be contacted about how the VA was mistreating a disabled Vietnam veteran.  (Plaintiff's Facts, ¶ 214).  On March 30, 2017, Grabski directed EMS and HR to permit Plaintiff to work the third shift as a housekeeping aid, not a Lead, although he continued to be paid as a Lead.  (*Id.*, ¶ 215).

[41] Plaintiff counters that rather than "offending," Plaintiff simply would not accept the demotion and wanted his disability to be accommodated.  (Plaintiff's Response to Defendant's Facts, ¶ 126).

17, 2017; disrespectful language on February 17, 2017; use of obscene language on February 6 and 7, 2017; and failure to follow instructions in March of 2017.[42]  (*Id.*, ¶ 127).  Plaintiff was permitted to stay on third shift until the Proposed Removal was processed.  (*Id.*, ¶ 141).[43]

On August 29, 2017, Repko mitigated Plaintiff's removal down to a 10-day suspension, to be served from September 17 through September 26, 2017.  (Defendant's Facts, ¶ 142). Repko testified that when deciding whether a removal should go forward or be mitigated to a lower punishment, he looks at previous discipline, whether the penalty or action fits the evidence and allegations, and whether it fits within what he perceived to be the appropriate range of discipline for the allegations.  (*Id.*, ¶ 143).  With respect to Plaintiff, Repko mitigated the removal to a suspension because he thought it was best to give Plaintiff another chance using progressive discipline.  (*Id.*, ¶ 144).[44]

On or about October 24, 2017, Leporin issued a Memorandum directing Plaintiff to report for second shift effective December 4, 2017, and changing his duty station from Jefferson Barracks to John Cochran.  (Defendant's Facts, ¶ 148; Plaintiff's Facts, ¶ 224).  Leporin testified that the "tour of duty change never stopped.  It was just interrupted over and over again, whether

---

[42] Plaintiff provides more detail about the proposed suspensions and removal, including an email communication between Kush and Larry Goscinski, a Caucasian employee relations specialist responsible for handling disciplinary matters for EMS, in which the two appear to make light of the termination.  (Plaintiff's Facts, ¶¶ 13, 254-271).

[43] Plaintiff asserts he was permitted to work third shift while the VA attempted to fire him only because his attorney threatened to go to the media.  (Plaintiff's Response to Defendant's Facts, ¶ 141).  The media eventually did get involved in December of 2017.  (Plaintiff's Facts, ¶¶ 235-239).

[44] Plaintiff adds that Repko testified he mitigated the discipline because there were a few charges he did not sustain, and because EMS was jumping straight from a reprimand to a removal with basically the same type of charges.  (Plaintiff's Response to Defendant's Facts, ¶ 144).  Plaintiff further maintains his RA request was the primary reason Repko mitigated the removal to a suspension, as the RA process had to be done the correct way before Plaintiff could continue to receive disciplinary actions.  (*Id.*).

it was light duty, some kind of disciplinary action, demand to bargain, reasonable accommodation." (Defendant's Facts, ¶ 149, quoting Leporin Dep. at 206:1-18). He continued to state that each time he issued a tour change to Plaintiff, he had been "given the go ahead [from] HR, because something was resolved, whether it was, you know, [Plaintiff] was offered a reasonable accommodation and he turned it down or it was a progressive discipline that was issued, and that was, you know, either issued and sustained or rescinded." (*Id.*, ¶ 150, quoting Leporin Dep. at 201:3-19). On October 31, 2017, Plaintiff (through counsel) objected to the TOD change because it did not accommodate Plaintiff's disability. (Plaintiff's Facts, ¶ 227). When a VA employee recommended a meeting with Plaintiff and his representative, Kush responded, "I refuse to allow Carter or his representative to bully us with hollow threats and insufficient evidence to support their point of view. Meeting is a moot point." (*Id.*, ¶ 228, quoting Kush Dep. at 175:12-18).[45]

On or about December 22, 2017, the VA offered Plaintiff a reassignment as a Housekeeping Aid on third shift, which would have required a voluntary demotion. (Defendant's Facts, ¶ 152). Plaintiff declined the offer, and there were discussions about removing him from service in December of 2017 and February, March, and April of 2018. (*Id.*, ¶¶ 153, 154). Proposed Removals were issued in May and June of 2018, but both were rescinded.[46] (*Id.*, ¶ 156). Plaintiff then was issued a Proposed Removal dated July 2, 2018, that

---

[45] When Lockamy (the LRAC) learned Leporin was once again issuing Plaintiff a TOD change, he questioned Leporin as follows: "Ok so why are we offering it to him again? Also we forced him into the tour he is currently on so why are we now changing his tour? I want to make sure we do not look like a bully here and are just doing this to him." (Plaintiff's Facts, ¶ 231).

[46] According to Plaintiff, the June proposed removal was rescinded because it accused Plaintiff of being AWOL when he was scheduled to be off work. (Plaintiff's Response to Defendant's Facts, ¶ 156).

contained three charges:  unauthorized absence (with seven specifications[47]), failure to follow proper leave requesting procedures/policy, and failure to follow uniform policy (with two specifications).  (*Id.*, ¶ 160; Defendant's Exh. K).

Defendant issued a Decision of Removal on July 25, 2018, with an effective date of August 3, 2018.  (Defendant's Facts, ¶ 162; Defendant's Exh. L).  On August 2, 2018, Plaintiff resigned from the VA.  (*Id.*, ¶ 168).  Plaintiff testified that at the time he submitted his resignation, he knew that the VA was planning to remove him.  (*Id.*,¶ 169).

On September 27, 2019, Plaintiff filed his Complaint pursuant to the Rehabilitation Act of 1973, as amended, 29 U.S.C. §§ 706, 791 *et seq*., the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, and the Family Medical Leave Act, 29 U.S.C. § 2615 *et seq.*  (Compl., ¶ 4).  Plaintiff asserts the following claims against Defendant:  Disability Discrimination (Count I); Retaliatory Discrimination (Count II); Hostile Work Environment (Count III); Race Discrimination (Count IV); and FMLA Entitlement (Count V).[48]  As noted above, the parties filed competing Motions for Summary Judgment on May 28, 2021, both claiming there exist no genuine issues of material fact and they are entitled to judgment as a matter of law.  (ECF Nos. 45, 47).

## SUMMARY JUDGMENT STANDARD

The Court may grant a motion for summary judgment if, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

---

[47] Specifications 1 and 7 eventually were dropped from charge 1.  (Defendant's Facts, ¶ 162).
[48] In a Memorandum and Order entered January 30, 2020, the Court dismissed Count V of Plaintiff's Complaint.  (ECF No. 14).

The substantive law determines which facts are critical and which are irrelevant.  Only disputes over facts that might affect the outcome will properly preclude summary judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Summary judgment is not proper if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  *Id.*

A moving party always bears the burden of informing the Court of the basis of its motion.  *Celotex*, 477 U.S. at 323.  Once the moving party discharges this burden, the nonmoving party must set forth specific facts demonstrating that there is a dispute as to a genuine issue of material fact, not the "mere existence of some alleged factual dispute."  Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 247.  The nonmoving party may not rest upon mere allegations or denials of its pleadings.  *Anderson*, 477 U.S. at 256.

In passing on a motion for summary judgment, the Court must view the facts in the light most favorable to the nonmoving party, and all justifiable inferences are to be drawn in its favor.  *Anderson*, 477 U.S. at 255.  The Court's function is not to weigh the evidence, but to determine whether there is a genuine issue for trial.  *Id.* at 249.

## DISCUSSION

### I.   Disability Discrimination

The Rehabilitation Act provides that, "[n]o otherwise qualified individual with a disability….shall, solely by reason of her or his disability,…be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency…."  29 U.S.C. § 794(a).  Thus, to establish a claim under the language of the Rehabilitation Act, Plaintiff must show "he was 'disabled,' was 'otherwise qualified,' and was the victim of 'discrimination' 'solely' because of his disability."  *Peebles v. Potter*, 354 F.3d 761, 765 (8th Cir. 2004).  The Rehabilitation Act adopts the standards applied under the Americans with Disabilities Act of 1990 ("ADA") to determine whether a violation of

the Act has occurred.  *Id.*

Under both the Act and the ADA, numerous kinds of discrimination emerge.  *Id.*  "Two means of discrimination are relevant to this case:  disparate treatment (i.e., intentional discrimination) and the failure to make reasonable accommodations."  *Id.*

### A.    Failure To Make Reasonable Accommodation

Under the Act, discrimination occurs "if 'a covered entity [does] not…make reasonable accommodation to the known physical or mental limitations of an otherwise qualified applicant or employee with a disability, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of its business.'"  *Peebles*, 354 F.3d at 766 (quoting 29 C.F.R. 1630.9(a) (2003)).

> Reasonable accommodation claims are not evaluated under the *McDonnell Douglas*[49] burden-shifting analysis.  Rather, a modified burden-shifting analysis is applied.  This is so because a claim against an employer for failing to reasonably accommodate a disabled employee does not turn on the employer's intent or actual motive….In a reasonable accommodation case, the discrimination is framed in terms of the failure to fulfill an affirmative duty—the failure to reasonably accommodate the disabled individual's limitations.

*Id.* at 766-67 (internal quotation marks and citations omitted).

When an employee has affirmatively requested accommodation, "the scope of the employer's obligation in this regard is determined through an informal, interactive process between the employer and the employee, identifying the limitations arising from the disability and potential reasonable accommodations that could overcome those limitations."  *Ballard v. Rubin*, 284 F.3d 957, 960 (8th Cir. 2002) (internal quotation marks and citation omitted).  "To show that an employer failed to participate in this interactive process, the employee must demonstrate that:  1) the employer knew about the employee's disability; 2) the employee

---

[49] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

requested accommodations or assistance for his or her disability; 3) the employer did not make a good faith effort to assist the employee in seeking accommodations; and 4) the employee could have been reasonably accommodated but for the employer's lack of good faith." *Id.* (internal quotation marks and citations omitted).   "The mere failure of an employer to engage in the interactive process does not give rise to *per se* liability, although for summary judgment purposes such failure is considered prima facie evidence that the employer may be acting in bad faith." *Id.* (citation omitted).

As support for his claim that Defendant failed reasonably to accommodate his known disability, Plaintiff notes that he first requested a reasonable accommodation on July 25, 2016, the same day he learned the VA planned to change his TOD.[50]  According to Plaintiff, VA policy provides that within five days of receiving the RA, the VA should have sent Plaintiff a Form 0857b, confirming that it had received his request, identifying the DMO, and advising him of next steps, including meeting with the DMO to discuss the request and options.  (Plaintiff's Facts, ¶¶ 91, 92).  The VA never issued the form, however, and Plaintiff maintains the DMO never met with him as part of the interactive process.  (*Id.*, ¶¶ 93, 248).[51]  Furthermore, Defendant issued neither a Form 0857c, providing Plaintiff with an interim accommodation while it sought additional medical documentation or more time to provide the RA, nor a Form 0857g, alerting Plaintiff that his RA request was denied because the accommodation would remove an essential function of the job and/or cause undue hardship.  (*Id.*, ¶¶ 94-95, 103-104).  Instead, Wright informed McDonald that Plaintiff should apply for a RA with Peacock (even

---

[50] As noted above, Plaintiff gave Leporin a statement from his VA doctor, Dr. Ram, dated July 25, 2016, stating that Plaintiff currently was being treated for agoraphobia, and it was in his best interest to continue working the night shift due to his issues regarding being around large crowds.

[51] Grabski, the DMO, testified that he did not even know how the interactive process worked at the VA.  (Plaintiff's Facts, ¶ 249).

though Plaintiff claims he had already requested a RA), and that Dr. Ram should redo the note so the department could better understand how many people constituted a crowd.[52]

As noted above, while the parties agree that Plaintiff then was permitted to remain on third shift, they disagree as to why such accommodation was made.  In other words, Defendant maintains he was allowed to do so as a provisional accommodation until the RA process was over, while Plaintiff counters he was left on third shift only because the Demand to Bargain issued on Plaintiff's tour change required such.

Dr. Ram provided the additional statement on September 12, 2016, confirming Plaintiff's agoraphobia and requesting an accommodation allowing for Plaintiff to remain on the night shift, where there is a reduced number of personnel.  Plaintiff himself later requested the accommodation of the nightshift on a Form 0857a, using medical documentation from his VA doctor on a Form 0857e.  (Plaintiff's Facts, ¶¶ 166-167).  Dr. Ram opined that Plaintiff was able to work the night shift, as he would be required to be around no more than 2 or 3 known people during his work.[53]

According to Plaintiff, there was no reason for the VA to refuse to accommodate his disability by leaving him on the nightshift, because there was no evidence that doing so would prevent Plaintiff from performing an essential function of the job, cause a direct threat to health or safety, or cause undue hardship to the operation of the unit.  In support of this contention, Plaintiff asserts the essential functions of his job were defined by the Position Description and the functions contained in his performance evaluations, and that when a function is listed as essential but is not performed by the incumbent, it generally is not considered essential for

---

[52] Again, Dr. Ram opined that "crowd" could not be defined in general; instead, he suggested that Defendant explore Plaintiff's own personal comfort level directly with Plaintiff, but Defendant never did so.

[53] As noted above, Plaintiff told Dr. Ram he believed he could work around six or seven people.

purposes of accommodation.   As such, although according to the Position Description the Housekeeping Aid Lead is expected to lead up to 15 people, in reality Plaintiff maintains he led only 2-3 housekeeping aids on the nightshift, and was rated fully successful in 2015/2016 and 2016/2017.   Plaintiff believes the VA refused to accommodate his disability simply because it did not want to, and/or because it was easier to accommodate his approved FMLA leave on another shift.   (Plaintiff's Facts, ¶ 125).   He further maintains the VA violated policy and law by basing its decision on assumptions and stereotypes, noting Leporin testified that EMS kept Fuller on as Housekeeping Aid Lead on third shift as well as Plaintiff, because it "needed somebody to be able to respond" to things Plaintiff's "mental illness [] doesn't allow him to."

Defendant counters that when considering what was required of a Housekeeping Aid Lead, HR focused on the need for a team leader to be able to lead up to 15 people, deal with customer service issues, deal with patient issues, and respond to emergencies in a group setting.[54] In deciding whether keeping Plaintiff on third shift as a Housekeeping Aid Lead would create an undue hardship for EMS, Defendant ultimately concluded that it would because EMS needed leadership available 24/7, and Plaintiff's inability to be around crowds of people (and/or potential mental instability) would impact patient care and patient safety.   Defendant further maintains it determined that allowing Plaintiff to remain on third shift would impact his disability, as he would be expected to lead up to ten people, and further would have to encounter patients and staff and respond to emergencies.[55]

---

[54] Plaintiff asserts Defendant's claim that he was required to handle emergency situations was made only after Plaintiff filed his lawsuit, and is not supported by the Position Description.

[55] Plaintiff counters that the best evidence he could have remained as a Lead on the nightshift is the VA's repeated efforts to make him a Lead on other shifts that similarly did not accommodate his disability.   In other words, although Leporin testified that the RA issue would have been resolved if Plaintiff had been willing to work the second shift as Lead, both he and Vaughn

Defendant asserts it then offered Plaintiff several RAs, each of which Plaintiff declined. For example, Defendant notes it offered Plaintiff the position of linen driver on or about January 25, 2017, which was higher than the position in which Plaintiff was working as Housekeeping Aid Lead and met the requirements contained in Dr. Ram's October 4, 2016, note, but Plaintiff declined the position on or about January 27, 2017. Defendant further notes that in March of 2017, the VA offered Plaintiff the opportunity to step down to the position of Housekeeping Aid on third shift voluntarily, but Plaintiff refused to sign the document enacting said change.

In reply, Plaintiff maintains he declined the linen driver position because it would have required him to lift up to 40 pounds and frequently move laundry bins, and he was told by his VA doctor on January 26, 2017, that he could not lift over 15 pounds or move laundry bins.[56] Furthermore, Plaintiff asserts the offer to remain on third shift as an aid was not a RA for his disability, as it constituted a demotion and he reasonably could have been accommodated as a Lead on the nightshift.

Upon consideration of the foregoing, the Court finds fact questions remain on Plaintiff's claim of failure to accommodate. In other words, the parties present conflicting evidence as to whether Defendant failed properly to engage in the interactive process, and/or whether he failed to demonstrate that Plaintiff's requested RA would have prevented him from performing an essential function of his job and/or resulted in undue hardship to Defendant. As such, both parties' Motions for Summary Judgment on this issue will be denied.

### B. **Disparate Treatment**

---

claimed Plaintiff's agoraphobia meant he could not be a Lead. (Plaintiff's Facts, ¶¶ 152, 186-189, 192, 194, 224, 229).

[56] As noted above, Plaintiff maintains he never was informed that he could accept the position but wait to begin working until his medical restrictions were lifted; instead, Plaintiff states he was told he would have to start immediately.

In his Complaint, Plaintiff alleges he was discriminated against on the basis of his disability when the VA:  (1) sent him home and charged him with AWOL when he reported to the only shift that accommodated his disability; (2) issued him a 10-day suspension; and (3) terminated/constructively discharged him.

"In disparate treatment cases, a similarly situated disabled individual is treated differently because of his disability than less- or non-disabled individuals." *Peebles*, 354 F.3d at 766.  "The key element is discriminatory intent." *Id.* (citation omitted).  "As such, the familiar three-step *McDonnell Douglas* approach is applied where no direct evidence of discrimination is available." *Id.* (citations omitted).  Thus, Plaintiff first must establish a prima facie case of discrimination by demonstrating "(1) that the plaintiff was disabled within the meaning of the [Act]; (2) that the plaintiff was qualified to perform the essential functions of the job [with or without a reasonable accommodation]; and (3) a causal connection between an adverse employment action and the disability." *Lipp v. Cargill Meat Solutions Corp.*, 911 F.3d 537, 544 (8th Cir. 2018) (internal quotation marks and citation omitted).  If the plaintiff succeeds, the burden of production then shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action.  *Id.*  If the employer is able to do so, "[t]he burden then returns to the plaintiff to show that the employer's proffered reason was a pretext for discrimination." *Id.* (citation omitted).

For purposes of summary judgment, Defendant does not dispute that Plaintiff can demonstrate he had a qualifying disability within the meaning of the Rehabilitation Act at the time he requested a reasonable accommodation in July of 2016.  According to Defendant, however, Plaintiff's restrictions from Dr. Ram rendered him unqualified for the position, because they prevented him from performing the essential functions of a Housekeeping Aid Lead.

In order to be a "qualified individual" within the meaning of the Rehabilitation Act, "an employee must (1) possess the requisite skill, education, experience, and training for his position, and (2) be able to perform the essential job functions, with or without reasonable accommodation." *Fenney v. Dakota, Minnesota & Eastern R.R. Co.*, 327 F.3d 707, 712 (8th Cir. 2003) (internal quotation marks and citation omitted).  "An employer is not obligated to hire additional employees or reassign existing workers to assist an employee in his essential duties." *Brunckhorst v. City of Oak Park Heights*, 914 F.3d 1177, 1183 (8th Cir. 2019) (internal quotation marks and citation omitted).

As noted above, Defendant asserts that when considering what was required of a Housekeeping Aid Lead, HR focused on the need for a team leader to be able to lead up to 15 people, deal with customer service issues, deal with patient issues, and respond to emergencies in a group setting.  While Leporin did not tell HR that Plaintiff could not be a Housekeeping Aid Lead because of his agoraphobia, he believes that "[w]ith [Plaintiff's] disability you can't be a team leader if you can't be around more than two or three people."

In his response, Plaintiff agrees that in determining the essential functions of a job, courts generally consider the employer's judgment as to which functions of the job are essential, the job description prepared, the consequences of not requiring the employee to perform the function, and the work experience of current and former employees.  *Benson v. Northwest Airlines, Inc.*, 62 F.3d 1108, 1113 (8th Cir. 1995).  The analysis happens, however, in the context of whether "the employer actually requires employees in the position to perform the functions that the employer asserts are essential."  *Id.* (internal quotation marks and citation omitted).  In other words, when a function is listed as essential but is not performed by the incumbent, it generally is not considered essential.

In the instant case, Plaintiff maintains that the essential functions of his job were defined by the Position Description and the functions contained in his performance evaluations.  As such, although according to the Position Description the Housekeeping Aid Lead is expected to lead up to 15 people, in reality Plaintiff maintains he led only 2-3 housekeeping aids on the nightshift, and was rated fully successful in 2015/2016 and 2016/2017.  Plaintiff thus maintains there is no evidence that his disability prevented him from performing the essential functions of his job on the nightshift.[57]

Upon consideration of the foregoing, the Court finds a genuine issue of material fact exists with respect to whether Plaintiff was qualified to perform the essential functions of a Housekeeping Aid Lead, either with or without a reasonable accommodation.  Therefore, in viewing the facts in the light most favorable to Plaintiff, the Court finds he establishes a prima facie case of disability discrimination, sufficient to survive Defendant's Motion for Summary Judgment.

Defendant next asserts that he had legitimate, nondiscriminatory reasons for the adverse employment actions taken against Plaintiff.  For example, with respect to the decision to charge Plaintiff AWOL, Defendant notes that once Plaintiff was issued the change of tour memorandum, he refused to report to work for his assigned shift, instead continuing to report for third shift.  Supervisors then sent Plaintiff home, and charged him as AWOL for not reporting as required.  Defendant further maintains that at times, Plaintiff failed to follow the proper procedures for requesting sick leave.  With respect to the suspension, Defendant notes that he issued progressive discipline to Plaintiff, and that Plaintiff generally admits to the conduct that

---

[57] Again, Plaintiff notes that Defendant fails to explain why he could not perform the essential functions of a Lead on the night shift, where he supervised only 2-3 people, but could perform those same functions on the day or evening shift, when there were 30 and 25 employees respectively.

served as the bases for the sustained charges in the suspension decision.  Finally, Defendant maintains his decision to remove Plaintiff was taken for legitimate, nondiscriminatory reasons, due to Plaintiff's accrued AWOL charges and his failure to follow proper leave requesting policies and uniform policies.

In response, Plaintiff provides evidence that Defendant's proffered reasons were merely a pretext for discrimination.  "Pretext may be shown with evidence that an employer has proffered an explanation with no basis in fact, with evidence that that plaintiff[] recently received favorable reviews, or with evidence that the employer's proffered reason for its employment decision has changed substantially over time."  *Morris v. City of Chillicothe*, 512 F.3d 1013, 1019 (8th Cir. 2008) (citation omitted).  Pretext also may be established by showing that similarly situated employees were treated more leniently than Plaintiff.  *Ebersole v. Novo Nordisk, Inc.*, 758 F.3d 917, 925 (8th Cir. 2014).  Here, Plaintiff points to evidence both that similarly situated employees were treated more favorably than Plaintiff, and that Defendant's proffered reasons for the adverse actions had no basis in fact and/or were a "set-up" in terms of the FMLA leave.  (*See* Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment, PP. 32-34).  The Court finds Plaintiff's evidence is sufficient to establish the possibility of pretext, and so this portion of Defendant's Motion for Summary Judgment must be denied.[58]

## II.    Retaliation

The ADA provides that "[n]o person shall discriminate against any individual because

---

[58] In his Motion for Summary Judgment, Plaintiff maintains he has presented direct evidence of discrimination, and so the *McDonnell Douglas* burden-shifting framework does not apply.  Even assuming this to be true, the Court finds Defendant provides evidence sufficient to create an issue of fact as to whether the same action would have been taken absent the illegal discrimination.  Plaintiff's Motion for Summary Judgment on the issue of disability discrimination will therefore be denied as well.

such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." *See* 42 U.S.C. § 12203(a).[59]   Pursuant to the *McDonnell Douglas* burden-shifting framework, the employee has the initial burden of establishing a prima facie case of retaliation, which he meets by showing, "(1) that he or she engaged in statutorily protected activity; (2) an adverse employment action was taken against him or her; and (3) a causal connection exists between the two events." *Lors v. Dean*, 746 F.3d 857, 867 (8th Cir. 2014) (internal quotation marks and citation omitted).   "If the plaintiff establishes a prima facie case, the burden then shifts to the defendant to show a non-retaliatory reason for the adverse employment action." *Id.* (internal quotation marks and citation omitted). "If the defendant can show a legitimate, non-retaliatory reason for its actions, the burden returns to the plaintiff who is then obligated to present evidence that (1) creates a question of fact as to whether [defendant's] reason was pretextual and (2) creates a reasonable inference that [defendant] acted in retaliation." *Id.* (internal quotation marks and citations omitted).

In the instant case, Plaintiff asserts he engaged in protected activity by asking for a RA, and by filing complaints of discrimination against the VA.[60]   As noted above, Plaintiff maintains he suffered numerous adverse employment actions, including being sent home and charged AWOL, being suspended, and being terminated.

Upon consideration of the parties' submissions, the Court finds genuine issues of material

---

[59] As relevant here, decisions interpreting the ADA and the Rehabilitation Act are applicable and interchangeable to claims made under each statute. *Hill v. Walker*, 737 F.3d 1209, 1216 (8th Cir. 2013).

[60] On or about October 28, 2016, Plaintiff filed a formal EEO complaint based on Leporin's effort to remove him from 3rd shift in violation of his need for reasonable accommodation. (Compl., ¶ 19).  He filed a second formal EEO complaint on or about August 2, 2017, related to Defendant's effort to terminate him.  (*Id.*, ¶ 41).

fact exist with respect to whether Defendant has shown a non-retaliatory reason for the adverse employment actions, and whether Plaintiff has successfully established pretext. Both parties' Motions for Summary Judgment on Plaintiff's claim of retaliation will therefore be denied.

## III.   Race Discrimination

When analyzing a Title VII race discrimination claim, the Court applies the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*. Under this framework, Plaintiff first must establish a prima facie case of discrimination. "A prima facie case of discrimination requires that the plaintiff '(1) is a member of a protected group; (2) was meeting the legitimate expectations of the employer; (3) suffered an adverse employment action; and (4) suffered under circumstances permitting an inference of discrimination.'" *Schaffhauser v. United Parcel Serv., Inc.*, 794 F.3d 899, 903 (8th Cir. 2015) (quoting *Davis v. Jefferson Hosp. Ass'n*, 685 F.3d 675, 681 (8th Cir. 2012)). Once the plaintiff establishes a prima facie case, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Id.* "If the employer meets this burden, the presumption of discrimination disappears, requiring the plaintiff to prove that the proffered justification is merely a pretext for discrimination." *Id.* (internal quotation marks and citation omitted).

For purposes of his Motion for Summary Judgment, Defendant does not dispute that Plaintiff was a member of a protected class, that he met his employer's legitimate expectations, and that he suffered an adverse employment action. Defendant maintains Plaintiff fails to establish circumstances giving rise to an inference of discrimination, however. As support, Defendant notes that Plaintiff acknowledged neither Leporin nor Kush ever said anything to Plaintiff that he found to be racially insensitive on its face, nor had he heard Leporin use a racially insensitive word when talking about other people. (*See* Plaintiff's Dep. at 232:13-233:6,

233:14-17). Plaintiff counters that he believes Leporin spoke to him in a racist or racially insensitive manner because Plaintiff was "old enough to be his daddy," and Leporin talked down to him and said "things to [Plaintiff] like [he's] his step-kid." (*Id.* at 229:20-21, 230:23-25). Plaintiff further points to testimony from McDonald that the ratio of African-American to Caucasian workers at EMS was changing at the time, and the union did not know why.

Upon consideration the Court will allow Plaintiff's race discrimination claim to proceed, as it finds Plaintiff's submissions sufficient to create an issue of fact as to whether he suffered under circumstances permitting an inference of discrimination. This portion of Defendant's Motion for Summary Judgment will therefore be denied.

## IV.   Hostile Work Environment

Finally, in Count III of his Complaint Plaintiff alleges harassment/hostile work environment on the bases of race and/or disability. "'[T]o establish a hostile work environment….plaintiff must show that (1) []he is a member of the class of people protected by the statute, (2) []he was subject to unwelcome harassment, (3) the harassment resulted from [his] membership in the protected class, and (4) the harassment was severe enough to affect the terms, conditions or privileges of [his] employment.'" *Johnson v. Robert McDonald Secretary Department of Veterans Affair*, No. 4:15CV1869 CAS, 2016 WL 5870061, at *5 (E.D. Mo. Oct. 7, 2016) (quoting *Sellers v. Deere & Co.*, 791 F.3d 938, 945 (8th Cir. 2015)).

As to the fourth element, "[i]n order to be actionable, harassment must be both subjectively hostile or abusive to the victim and 'severe and pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive.'" *Shaver v. Independent Stave Co.*, 350 F.3d 716, 721 (8th Cir. 2003) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21-22, 114 S.Ct. 367, 126 L.Ed.2d 295

(1993)).   "Anti-discrimination laws do not establish codes of civility in the workplace and '[c]onduct that is merely rude, abrasive, unkind, or insensitive does not come within the scope of the law.'"  *Johnson*, 2016 WL 5870061, at *5 (citation omitted).  In order to determine whether the harassment affected a term, condition or privilege of employment, courts must "consider the totality of the circumstances, including the frequency and severity of the conduct, whether it is physically threatening or humiliating, and whether it unreasonably interferes with [Plaintiff's] job performance."  *Sellers*, 791 F.3d at 945 (internal quotation marks and citation omitted).

"'The Supreme Court has cautioned courts to be alert for workplace behavior that does not rise to the level of actionable harassment.'"  *Moses v. Dassault Falcon Jet-Wilmington Corp.*, 894 F.3d 911, 922 (8th Cir. 2018) (quoting *Al-Zubaidy v. TEK Indus., Inc.,* 406 F.3d 1030, 1038 (8th Cir. 2005)).

> The stringent hostile work environment standard is designed to filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language ... and occasional teasing.  [M]erely rude or unpleasant conduct are insufficient to affect the terms and conditions of employment.  The plaintiff must show that the alleged harassment was so intimidating, offensive, or hostile that it poisoned the work environment.  [S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment.

*Id.* at 922-23 (internal quotation marks and citations omitted).

Upon consideration, the Court finds that Plaintiff has presented evidence sufficient to support his hostile work environment claim.  Specifically, Plaintiff claims that despite knowing he had a disability that could easily be accommodated by leaving him on the night shift, Defendant repeatedly attempted to move him to earlier shifts.  Defendant did so after claiming to be concerned about putting Plaintiff in harm's way by affecting his emotional stability.  Defendant further charged Plaintiff with being AWOL when he reported to the only shift that

accommodated his disability.  He further attempted to force Plaintiff to accept a demotion with lower pay, rather than accommodate him, and then tried to fire Plaintiff on multiple occasions.[61] The Court finds these alleged incidents to be more than merely rude or unpleasant; instead, should they prove true they potentially represent events severe enough to affect the terms, conditions or privileges of Plaintiff's employment and unreasonably interfere with his job performance.  This portion of Defendant's Motion for Summary Judgment will therefore be denied.

## CONCLUSION

Accordingly,

**IT IS HEREBY ORDERED** that Defendant Denis McDonough's Motion for Summary Judgment (ECF No. 45) is **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiff Eric Carter's Motion for Partial Summary Judgment (ECF No. 47) is **DENIED**.

Dated this 9th Day of November, 2021.

/s/ Jean C. Hamilton
UNITED STATES DISTRICT JUDGE

---

[61] Plaintiff claims that he was hospitalized after one of the incidents used to justify his removal. (*See* Plaintiff's Facts, ¶¶ 333-339).

- 31 -